S. A. HAWKINS *et al. v.* GLENS FALLS INSURANCE COMPANY

(No. 7930)

Submitted October 30, 1934.    Decided December 4, 1934.

See, also, 114 W. Va. 287, 171 S. E. 645.

*Steptoe & Johnson, Stanley C. Morris* and *J. Hornor Davis, 2d,* for plaintiff in error.
*Sale, St. Clair & Sale,* for defendants in error.

KENNA, JUDGE:

S. A. Hawkins and Hattie B. Hawkins, trading and doing business as Hawkins Sundry Company, brought notice of motion on a fire insurance policy issued to them by the defendant, Glens Falls Insurance Company, upon a stock of goods located in a building wherein they did ·a drug store business at Davy, McDowell County, West Virginia. A demurrer to the notice was overruled and the defendant pleaded the general issue, filed a special plea alleging that the insured property had been burned by the policyholders or by one of them, and filed its specifications of defense, setting out several respects in which it contended that conditions and warranties of the policy of insurance had been violated by the policyholders. From a judgment, based upon a verdict in favor of the plaintiffs for $1,012.02, the defendant company prosecutes this writ of error.

The errors relied upon here by the defendant in the trial court are:

(1) That at the trial it proved incendiarism to the degree that all reasonable minds would unite in regarding it established as a fact and therefore that the trial court erred in refusing a peremptory instruction in behalf of the defendant.

(2) That inasmuch as the plaintiffs filed a proof of

loss in which they made oath to a total destruction of the insured property, and inasmuch as the proof at the trial shows that a material and valuable part of the property insured was salvaged, that the insured are shown as a matter of law to have been guilty of a fraudulent breach of the conditions of the policy, and therefore the trial court erred in not giving a peremptory instruction on behalf of the defendant; and

(3)   That the trial court erred in the giving of certain instructions on behalf of the plaintiffs and in refusing to give certain instructions on behalf of the defendant.

The struggle in the trial court was lengthy, tedious and vigorously contested on both sides; each issue of fact was developed and countered to its ultimate ramification. Within the scope of a written opinion, we cannot discuss all of the various matters of fact upon which the decision of the case must, in the main, rest.   We simply comment upon those that seem to us controlling.

The place of business operated by the plaintiffs was in a street running parallel with the railroad which lay across the street from plaintiffs' store.   Looking from the railroad towards plaintiffs' store, to the right is the Sneider-Harris building, and to the left is the building occupied by the Army & Navy store. All three buildings are two-story, and the proof shows that in the building occupied by the plaintiffs' store, there is an apartment in which his family lived, and that there is a similar apartment over the Army & Navy store in which the Hunt family lived.   Both the buildings occupied by plaintiffs and the Army & Navy store are of brick construction. The three buildings do not adjoin, but are separated by spaces apparently about six  feet  wide,  and  between the Army & Navy store building and the building occupied by the plaintiffs an outdoor stairway goes up from the sidewalk to a covered landing from which both the apartments are entered.

On the night of Friday, July 30, 1932, fire broke out in the Sneider-Harris building.   This fire burned all that night, all of the following day and into Sunday, the day

on which the fire broke out about two o'clock in the morning in the plaintiffs' place of business.

The main circumstances depended upon by the plaintiff in error as showing incendiarism are the following:

1. A conversation had between six and seven o'clock on the evening of the day preceding the fire (which occurred between two and three o'clock in the morning) between Tipton Hawkins, son of the insured, and Katherine Hunt and Gladys Davis, who were at the time residing in the adjoining apartment, in which it is asserted that Tipton Hawkins stated that there would be another fire that night in the drug store building adjoining, that they had better pack their stuff and get ready to move, and that they would not, the next day, at that place, eat a chicken that they were preparing. When asked how he knew there would be another fire, he allegedly stated he had heard a conversation on the roof of the drug store building immediately before the time at which he was speaking, "that didn't sound so good".

Katherine Hunt and Gladys Davis both testified to the statement supposedly made by Tipton Hawkins in this conversation. Tipton Hawkins denied the statements categorically and in detail. It is urged by the plaintiff in error that Tipton Hawkins' own bare denial should not be accepted as overcoming the superior proof of the defendant on this question. At best, this is a difficult proposal to accept as a matter of law. Since, under the circumstances, the bare denial of Tipton Hawkins appears to have been the only proof available to the defendant in this connection, we cannot escape regarding it as a jury question.

2. A conversation had by Tipton Hawkins with Carl Burgess immediately preceding the fire, and the circumstances leading up to that conversation. Burgess testified that he happened by the drug store just a few minutes before the fire, and that Tipton Hawkins at that time was standing at the front doorway with a shotgun resting against his chest, holding the main door open with one hand and the screen door open with the other; that while in this position and before discovering the

presence of Burgess, Hawkins spoke to someone in the back of the drug store in effect saying, "for God's sake" for them to hurry before a crowd gathered, to which adjuration by Hawkins the person in the back of the store responded, "O. K., it wont be long now". Just after this occurred, according to Burgess' testimony, Clarence Griffith walked out past Hawkins at the front door and spoke to him, Burgess, after which Hawkins pushed him and urged him to leave because something was about to happen he would not wish to witness. Burgess testified that he went home and within a few minutes, the alarm drew him back to the drug store where the fire was in progress.

Clarence Griffith was produced as a witness for the defendant in the trial court, but was not asked concerning this circumstance. He totally fails to corroborate the statement of Burgess. Furthermore, the whole of it was unequivocally and emphatically denied by Tipton Hawkins, and several other witnesses who were with Tipton Hawkins on the evening of the fire testified to circumstances that would have rendered it highly improbable, if not impossible, of occurrence. In these circumstances, we cannot fail to believe it was a question for the jury.

3. Clarence Griffith, who was employed at the garage operated by Hunt, another witness for defendant, testified that on the evening of the fire he at one time had sold five gallons of gasoline to Tipton Hawkins and four gallons to Max Cline, and that on each occasion, the gasoline had been taken away in a container furnished by Griffith; and that on the last occasion, when Hawkins took the gasoline away, Griffith asked him what he was going to do with it, and received a reply indicating the purpose of Hawkins to be the burning of the drug store and the finishing of the burning of the clothing store next door. Griffith testified that he went with Hawkins to the drug store building and there saw the gasoline inside the building.

On this question, Hawkins is impeached by contradictory statements of his own concerning the sale of the

gasoline; not only that, but Tipton Hawkins, Max Cline, and other witnesses, either categorically deny everything that Griffith says, or testify to certain circumstances rendering the occurrences related by Griffith unlikely of happening. This, we think, was a jury matter.

4. Testimony was introduced tending to show that the roof of the drug store building had been pried up by someone, supposedly with a view to creating an air current between the roof and the ceiling of the second story, down through a pantry in the second story in the floor of which a hole had been cut, and in the ceiling of which was a cathole leading to the space under the roof, thus creating a draft rendering a fire on the first floor much more likely to accomplish the purpose for which it was set. The defendant introduced several witnesses who testified that at the back of the building, they had seen on the right-hand side looking back, a parting of some six or eight inches between the roof and the ceiling joists of the second floor. Defendant also produced the builder who erected the building and the tinner who put the roof on it, and both stated that this had occurred.

The plaintiffs met this proof by the testimony of Mr. and Mrs. Hawkins, who resided in the apartment just above the drug store and just under the roof in question, who stated that it could not have been done without passing through their apartment, and that no such thing had occurred. Plaintiffs also produced a builder (brother-in-law of plaintiff, Hawkins) and three experienced carpenters who testified that it would not have been possible to raise the roof without the use of jacks or other instruments, which, owing to the slant of the roof back to the point where it was allegedly raised and where the roof and ceiling met, there would not have been room to insert. Plaintiffs further contend that in no event would Hawkins, the insured, have planned a fire that would virtually have made a flue of the apartment in which his wife, his wife's sister and her two young children, and he, himself, were sleeping. This, we think, was a jury question.

5. The burning of the ceiling of the upstairs back

porch in the drug store building, which the defendant contends occurred on the night of the drug store fire and was entirely disconnected with the burning on the ground floor of the drug store building at the same time, but bore a direct connection to the raising of the roof in the drug store building. Defendant produces witnesses who testify to its version of this occurrence.

The plaintiffs counter the defendant's proof on this subject by producing witnesses who testify that the burning of the upstairs back porch on the drug store building occurred the previous night when the Sneider-Harris building was burning, that a small hose was connected in the apartment for the purpose of fighting the fire communicated to the upstairs back porch of the drug store building by the Sneider-Harris fire, and that no burning occurred at that point on the night of the drug store fire. In this state of the proof, we think this item, both as to the inference to be drawn from it, if it did occur on the night of the drug store fire, and the fact of whether it occurred at that time or on the previous night, were properly left to the jury.

In this conflicting state of the evidence upon the question of incendiarism, not at this time discussing the question of whether the insured were connected properly with that question, we believe that the learned trial judge did not err in letting the question of whether incendiarism had been shown as a fact to go to the jury for determination.

On the question of salvage, it is undoubtedly true, according to the evidence, that a long list of articles was removed after the fire from the drug store room and was saved by the plaintiffs and not included in their proof of loss. The company claims that this constituted a fraudulent misrepresentation on the part of plaintiffs sufficient to bar recovery, or, if not, that it was a breach of an express condition of the policy contract that required the separation, inventorying and reporting of salvaged property. In order to overcome this contention of the defendant, the plaintiffs advance the testimony of

S. A. Hawkins, which is uncontradicted and to the following effect: that he notified the company immediately after the fire, which occurred Saturday evening, and that almost at once, and probably on the next Monday morning, an adjuster by the name of Hale directly representing the defendant, and another adjuster by the name of Drake, representing other companies that carried insurance on the stock and fixtures, came to Davy. Hawkins testified that he at once turned over to these adjusters all of his books and inventories at the residence of Mrs. Carter; that he there asked Hale what he should do with the articles that had not been completely destroyed, and that Hale's only reply was for him to read his policy and conform to the stipulations therein respecting salvage; that he thereupon informed the adjusters that the articles in question were still in the drug store room and offered to take both of them there for an inspection; that Hale told him to take Drake for that purpose while he, Hale, remained to work on the books; that he did take Drake to the drug store room and that Drake there went completely over everything that was in the drug store room; that thereafter, with the assistance of his wife and some two or three other persons, he removed the articles to his apartment upstairs by means of carrying them in tubs; that they were of no particular value, being watersoaked and having the labels washed off, but that nevertheless, he caused an accurate and complete list of them to be made so that he would have it in the event the question arose; this list was produced on the trial and introduced in evidence. It appears in the record and comprises some six or eight pages, each item occupying a line. No particular value was shown and the articles salvaged were still in plaintiffs' possession at the time of trial, with the exception of a small part that had been stolen. Neither Hale nor Drake was produced as a witness by the defendant at the trial. At the request of the defendant, the court gave defendant's instruction No. 11, which told the jury that if they believed from the evidence that the insured had failed to comply with that provision of the

policy relating to the separation of damaged and undamaged personal property, putting it in the best order possible and furnishing an inventory of the destroyed, damaged and undamaged property, that the insured could not recover. The court also gave, at the instance of the defendant, its instruction No. 13, which told the jury that if the conduct of the plaintiffs in this connection constituted a fraudulent misrepresentation to the company, that then the plaintiffs could not recover.

As this evidence stands, we do not believe that either of defendant's theories, as advanced in the two instructions tendered and given, can be decided in its favor as a matter of law. We think that both theories were properly for the jury, and were correctly submitted by the two instructions of the defendant, above referred to.

The plaintiff in error contends that it was prejudiced by the refusal of the trial court to give defendant's instruction No. 21, because of the fact that this instruction submitted to the jury the question of the bringing on the premises, by Tipton Hawkins, of five gallons of gasoline. The plaintiffs below meet this contention by pointing to defendant's instruction No. 20, which was given, and state that instruction No. 20 adequately covers the question embraced in defendant's instruction No. 21, refused. Although there may be some very slight technical difference in the effect of the instructions in question, we are of opinion that instruction No. 20 adequately presents to the jury the question of increased hazard by reason of the presence of gasoline on the premises that may have been brought there, or permitted to be brought there, by Tipton Hawkins, and therefore that it was not error to refuse defendant's instruction No. 21.

The defendant below further contends that it was error for the trial court to refuse to give defendant's instructions Nos. 15 and 19. Each of these instructions goes into some detail in picking out matters of the defendant's proof, and stating to the jury that in reaching their conclusion they shall give the specified matters that defendant's proof tends to establish, due consideration. They are both lengthy and the state-

ments contained in each are rather involved. They state the duty of the jury, perhaps, with technical accuracy. But we agree with the contention of the defendant in error to the effect that their tendency is to overemphasize the plaintiff's proof, and to argue to the jury the effect that is to be given to its details. If instructions of this character are to be sanctioned to the extent of holding it reversible error to refuse to give them, we are at a loss to know where the proper line could be drawn. Certainly, instructions which would propound to the jury all the evidentiary contentions of both plaintiff and defendant could not be given. This is the province of argument to the jury, and to require it in instructions, we think, would but tend to tediousness and confusion in the trial of jury cases. We do not believe that it was error for the trial court to refuse the two instructions in question.

The plaintiff in error contends that it was prejudicial to it for the trial court to give plaintiffs' instruction No. 2, which reads as follows:

"The Court instructs the jury that even though they may believe from the evidence that Tipton Hawkins set fire to the building in which the property involved was located, yet that fact will not prevent the plaintiffs from recovering unless the jury should furthermore believe from the evidence that he did so at the instance of or with the knowledge, consent or connivance of the plaintiffs, S. A. and Hattie B. Hawkins, or one of them."

And to refuse to give defendant's instruction No. 18, which reads as follows:

"The court instructs the jury that under the circumstances of this case the acts of Tipton Hawkins were attributable to the plaintiffs herein, and if you believe from all the evidence in this case that Tipton Hawkins procured or assisted in the burning of the property herein involved, then the plaintiffs cannot recover herein and you may find for the defendant."

It will be observed that these instructions present dia-: metrically conflicting theories of the law respecting incendiarism by an agent. Plaintiffs' instruction No. 2 requires that the jury must believe that the insured procured the act of the agent in doing the burning or that it was done at plaintiffs' instance or with their knowledge, consent or connivance, in order to bar a recovery. On the other hand, defendant's instruction No. 18 is based upon the proposition that the act of the agent precludes the policyholder from recovering in the event that the agent of the policyholder burns the insured property even without the policyholder's knowledge.

To sustain its contention in this respect, the plaintiff in error depends upon the case of *Sternberg* v. *Merchants' Fire Assurance Corporation,* decided in the United States District Court for the Eastern District of Wisconsin, March 13, 1934, and reported in 6 F. Supp. 541. In that case, a son of the owner of a hotel property had been placed by his father in complete charge of the property as caretaker. The fire was admittedly of incendiary origin and there was no dispute as to the general agency of the son and his full representation of the father.

In reaching its conclusion, the court said:

"If, therefore, we start with the notion that an insured owes a duty, as above indicated, it is difficult to find a justification for limiting the consequences of violation of such duty by himself personally, and refuse to impute or ascribe to him what ought to be implicit warranty that his delegate, his substitute, and alter ego, will likewise not violate it. It cannot be that, if the insured owes the duty, his agent or substitute has the privilege of not respecting it, and thus give the insured the benefit of the contract. In ascribing to an insured the responsibility of the tortious act of his servant, as a basis of defense by the insurer, the principle which is invoked strikes me as identical with that which is the basis of liability of a railroad company, upon imputation, for deliberate tort of its servant. *Craker* v. *Chicago & Northwestern Ry. Co.,* 36 Wis. 657, 17 Am. Rep. 504. This, again, is upon

> the assumption that the insured owes the negative duty indicated; and that observance of such duty may be exacted not only from him personally, but also from those who are deputed to stand for him in respect of the subject of insurance."

In our opinion, the learned trial judge there has stated a conclusion that is a *non sequitur* of his major and minor premises. Because a railroad is responsible in a tort action for the conduct of its agent within the scope of his employment and because in an action on contract, a building may be burned by the agent of the insured, it does not follow that the insured must be held responsible for the criminal act of his agent that he neither authorized, ratified or knew about, and which, in the nature of things, could not, without previous authorization or subsequent ratification, be within the scope of the agent's authority. Although the statement is undoubtedly based upon slender authority, because of the extremely limited number of cases in which the question has been directly presented as a matter of law, we believe that the general statement of the law contained in 14 Ruling Case Law, page 1223, is sound. We quote it: "If, however, the insured was insane when he destroyed the property, a recovery may be had, and the fact that the property was intentionally burned by the insured's husband, wife or *agent* does not defeat a recovery, where the insured was not a party thereto." That a mere family relationship does not raise the presumption of participation in incendiarism is attested by two cases which hold that the wife can recover in spite of incendiarism by the husband where no participation on the part of the wife is shown. *Union Ins. Co.* v. *McCullough,* (Neb.) 96 N. W. 79; *Plinsky* v. *Germania Fire & Marine Ins.* Co., 32 Fed. 47. The following cases hold that mere agency without proof of knowledge, authorization or ratification on the part of the insured will not defeat recovery in the event that the agent is shown to have burned the insured property. *Henderson* v. *Western Marine & Fire Ins. Co.,* 10 Robinson 164, 43 Am. Dec. 176, and *Feibelman* v. *Manchester*

*Fire Assurance Co.*, 108 Ala. 180; 19 So. 540, where the court said:

"There is no evidence in the record and none was proposed to be introduced, tending to connect the plaintiff, in any way, with the burning of the property. She resided in another State, and the property was in sole charge and custody of her agent, M. J. Feibelman. If the property was fraudulently destroyed all the criminating evidence, on that subject, tends to show it was committed by M. J. Feibelman, without any proof of knowledge thereof, or participation therein, by the plaintiff. There is no provision in the policy that plaintiff should be responsible for the fraudulent destruction of the property by her agent, under such circumstances. The authorities are meagre upon the question, but we have given it due consideration, in conference, and are of the opinion that such losses are within the perils of the policy, unless specially excepted therefrom by some clause or condition of the policy. *Henderson* v. *Insurance Co.*, 10 Rab. (La.) 164, S. C. 43 Am. Dec. 176; *Perry* v. *Mechanics Mut. Ins. Co.*, 11 Feb. Rep. 485; *Plinsky* v. *Germania F. Ins. Co.*, 32 Fed. Rep. 47. The case of *Midland Ins. Co.* v. *Smith,* 6 Law Reports, Q. B. Div. 561, was one of a felonious burning of the property by the wife of the assured. The judge said: 'I have no hesitation in saying that it appears to me to be upon principle perfectly clear and free from doubt that such a loss would be covered by an ordinary policy against loss by fire; under such a policy the company would be liable for every loss caused by fire unless the fire itself were caused and procured by the wilful act of the assured himself, or some one acting with his privity and consent. In order to escape from responsibility for such a loss as the present the company ought to introduce into their policy an express exception.' Evidence, therefore, implicating M. J. Feibelman in the alleged fraud, is immaterial and irrelevant, unless connected with proof of guilty complicity therein, on the part of the plaintiff herself. The acquittal of M. Feibelman of the charge of arson has no relevancy to the case."

An examination of the cases in which corporations have been barred from recovery on account of incendiarism, we believe, will disclose (as does the case of *Kimball Ice Company* v. *Hartford Fire Ins. Co.*, decided April 12, 1927, in the Circuit Court of Appeals for the Fourth Circuit, and reported in 18 Fed. (2d) 563) that they turn primarily upon the question of the incendiary being interested as a stockholder, or otherwise, in the insured property, and not primarily upon the question of agency.

We cannot, however, refrain from commenting that under the circumstances of this case, and under the circumstances of cases similar to it, where a close family relationship exists between the person who, it is alleged, did the actual burning and the insured, an instruction is fully warranted which would tell the jury in no unmistakable terms that in reaching their conclusion as to the participation of the insured in the incendiarism that such proof need not be based upon direct evidence, but might be shown by the circumstances, and stating further that in judging of the circumstances, the jury might consider the family relationship involved and the unlikelihood of direct proof being available where such relationship exists. We do not regard the giving of such an instruction, under the circumstances, as being an infringement of the rule under which we held it was not error to refuse to give defendant's instructions Nos. 15 and 19. Furthermore, we regard the position as being amply justified by the line of cases holding that, while family relationship is not a badge of fraud, it may yet be considered as a strong circumstance indicating fraud under certain conditions. *Miller* v. *Correll*, 97 W. Va. 215, 124 S. E. 683: *Swope* v. *Wade*, 106 W. Va. 265, 145 S. E. 384.

There being, in our opinion, no error prejudicial to defendant below in the rulings of the trial court, the judgment of the circuit court of McDowell County is affirmed.

*Affirmed.*