# Richmond

AETNA INSURANCE COMPANY, A CORPORATION V. L. LOUISE CARPENTER.

April 28, 1938.

Present, All the Justices.

The opinion states the case.

*Alexander H. Sands,* for the plaintiff in error.

*E. H. DeJarnette, Jr.,* and *H. C. DeJarnette,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This action was instituted by L. Louise Carpenter to recover from the Aetna Insurance Company, a corporation, the sum of $1,500 for a loss by fire on property covered by two fire insurance policies issued by the latter corporation. One of the policies contained a clause providing that loss or damage, if any, should be payable to Wilbur C. Hall, trustee, as his interest might appear, by reason of a lien against the said property secured by a deed of trust in the sum of $500. The trustee became a party plaintiff to this action.

The case was twice submitted to a jury. The first trial resulted in a hung jury, and the second in a verdict for the plaintiff.

The insurance company admitted liability in so far as the claim of the noteholder was concerned, and has satisfied his claim. It denied liability to the insured, L. Louise Carpenter, and filed several grounds of defense. It here abandons all grounds save that the fire which occasioned the loss was not accidental, but was caused either by or with the connivance of the insured, or was deliberately set by the agent of the insured for whose action the insured was responsible even though the agent was not so instructed.

The trial judge refused to set aside the verdict of the jury, and from the judgment entered in favor of the insured, the plaintiff in error appealed.

Hereinafter we will refer to the plaintiff in error as the insurer or defendant, and to the defendant in error as the insured or the plaintiff, the respective positions they occupied in the trial court.

 In view of the verdict of the jury and its affirmance by the trial court, under familiar principles, we must review the evidence in the light most favorable to the insured.

Louise Carpenter is a negro woman, who says she is about forty years of age. She owned a farm of about twenty acres in Orange county. Her husband died, leaving her with nine small children, whose ages at the time of the fire ranged from three to seventeen years, the oldest being feeble-minded. On March 9, 1934, in order to improve the opportunity to secure work for herself and her children, she bought some land and a frame dwelling, the property in question here, in Fairfax county, close to the town of Herndon. As a part of the consideration for the purchase, she assumed a deed of trust thereon securing the payment of $500. She and her children then moved their residence to the new location.

The former owner carried fire insurance on this property with the insurer here. Louise Carpenter notified the local agent of the insured of her purchase, and, by writing, requested him to renew the former policy of fire insurance at its expiration, and stated her desire to have some insurance on her furniture. The insurance company issued to her two policies, one of these policies being for a coverage of $1,000 upon the frame dwelling; $400 on a frame barn and $50 each on a hen house and meat house. The policies extended from January 1, 1935, to the 31st day of January, 1936. The second policy covered the household and personal effects in the sum of $500.

On the 27th day of April, 1935, at about 1:45 o'clock in the morning, the dwelling and the household furniture therein contained were destroyed by fire. On the night of the fire, Louise Carpenter was away from home, having gone to the home of her brother-in-law, in Culpeper county, on a visit and to perform an errand. She left Herndon about

3:30 p. m. on April 26, 1935. That night, all of the children were at home, some sleeping downstairs and some upstairs.

Hattie Carpenter, a daughter, then fifteen years of age, said she was awakened during the night by smoke, and found the house full of smoke with the fire advanced to the porch of the house; that she aroused the other children who were in bed, and she and her brother, Harry, got them out; that they were unable to save anything, but a portion of their clothes, not even all of them saving their shoes; that the fire was so advanced after it was discovered that they dared not go back into the house; and that the children, including Mary, her sister, had to dress out in the field with such clothes as they could grab in their rush from the house.

Harry Carpenter, another child, says that when he was awakened he found smoke in the house and hall, and together with the other children, got his clothes, went outdoors, and dressed out there; that one of the children, Clara, came near being burned, but he went in and brought her out; that he slept downstairs and when Hattie came down giving the alarm, he was asleep, as well as his sister, Mary, who slept on the same floor; and that the fire appeared to be between the walls and the back porch, and nearly half of the side of the house was burning from the inside.

Louise Carpenter returned home to find the dwelling and its contents completely destroyed, including personal clothing, beds, bed clothing, and all of her furniture. She had nothing of furniture and personal belongings left except some old and used belongings which had been stored in the second story of the barn, being that which she had removed from her former and larger home in Orange county, and which, on account of the smaller new home, could not be placed therein. The value of this latter property was generally estimated at $50 or $75.

While she still remained the owner of her former home in Orange county, it had been rented out. No provision had been made for her return thereto, and she and her children were compelled to live as best they could in the barn near

the destroyed home. She remained there, doing her cooking outdoors, although the situation became intolerable, until she was able, with assistance, to find a better home.

On her return April 27th from Culpeper county to her burned property, she met the fire chief of Herndon. She says he told her that she could not go into any of the buildings on the place, and that he accused her of burning down the house, or having it burned in order to secure the insurance; that he said "They will take you and put you in prison a long time before they try you, and you will get eighteen to twenty years in the penitentiary"; that after continuous threats of this nature and many questions and much talking by him and others, in order not to be separated from her children, and through the fear engendered by the threats she said, "I will give up the place rather than be taken from my children"; that thereupon the fire chief wrote out the following statement, which she signed: "I am willing to forfeit my insurance if it will keep me out of prison. This is of my free will and accord"; and that they then arrested her, charged her with burning the house, and she was placed under $1,000 bond for her appearance in court.

A few weeks before this fire another fire had been discovered in the house by her children while the mother was away. It was extinguished with small damage, and no claim made therefor. Louise says that being in doubt as to the fire, she made no report, hoping that some inquiry or development would disclose the source. While this action has been pending, the barn covered by the same insurance policy was burned after Louise and her family had removed from the premises. Loss in this latter instance is not involved in this proceeding.

Proof of loss on account of the dwelling and furniture was made and filed, and the defendant refused payment. This action was brought, but delayed until after the trial of Louise Carpenter for arson. On her trial she was acquitted.

There is no contention that the value of the property destroyed was less than the amount for which it was insured. Witnesses testified that the dwelling was worth

around $1,600, and the furniture and personal property around $700.

A number of witnesses testified to the general good reputation of the insured for truth and honesty.

There was evidence that Louise Carpenter had occasion to punish one of her sons for some violation of her rules, and the intimation is sought to be brought out in the record that the son might have sought revenge by burning the property. There is also a suggestion that her presence in the neighborhood was resented by white persons residing there. Louise Carpenter does not attribute the fire to either source.

For the defense, Mr. Sam Steiner, a deputy fire marshal, testified that on April 27th, he went to Herndon to investigate the fire; that he interviewed Louise Carpenter and her daughter, Mary Carpenter, separately; that he made no threats to Louise, and she signed the statement above referred to voluntarily; and he then directed a warrant to issue for her arrest. In his interview with Mary Carpenter, who was then about sixteen years of age, he secured a written statement. In this statement written out by one of the white persons present, Mary said that her little brother, Sammy, told her that the mother left word to save the children when the house was burned; she had heard her mother say that if she did not set it afire some one else would; that her mother planned the whole thing and was responsible for the fire; and that Sammy gave her a note in a sealed envelope, which said that after the house was set on fire, to call the fire department; and that this note was left in the house that burned.

Again, on the following day another statement, in writing, was secured from Mary Carpenter, which was written by one of the officers, and read to her and by her signed. In this statement she said her brother Sammy gave her a letter from her mother, which said "to save the children and to set the house afire at about 1:30 a. m., Saturday, April 27, 1935"; that her mother, about six weeks before, said that she had just as well burn the house down as for some one else to burn it down; that she set fire to some

paper upstairs in a room and the children and herself went out of the house; that she and Harry went back and rescued Clara, who had been left in the house; and that the statement was made of her own free will. Several witnesses, including the fire chief, the fire marshal and a police officer, testified to hearing Mary's declarations and witnessing her signature to the statements. Each said that no threats or inducements were made to procure same.

At the time of offering the testimony with reference to the oral and written statements of Mary, Mary was available as a witness, but had not been called by either party as such. Except for the statements alleged to have been made by her, there was no other evidence of a conspiracy between Mary and her mother to burn the property. The oral and written statements made by Mary were secured out of the presence of the mother.

Counsel for the plaintiff vigorously objected to the admission of such evidence, both as violating the rule of hearsay, and because there was no proof of a conspiracy. Cross-error has not been properly assigned.

Mary Carpenter was subsequently called as a witness for the plaintiff. She vigorously and positively denied that her mother had either told her, authorized her, directed her, or written her, in any manner directly or indirectly, to burn the house, or consented that it should be done. She stated that she did not set fire to the house, and did not have any idea how the fire started. She said that she had made the oral and written statements to the contrary, at the request, direction and suggestion of the investigators, and under threats and duress, and that such former statements, oral and written, were wholly false and untrue.

The learned trial judge, in instruction number 8, as hereinafter set out, undertook to instruct the jury as to the consideration which it should give to all statements made by Mary Carpener out of the presence of her mother. If Mary had previously testified in favor of her mother, any other statements made by her, at other times, inconsistent with her testimony, might also have been introduced for the

purpose of contradicting the witness. Virginia Code 1936, section 6215.

The insurer argues that the finding of certain personal property in the loft of the barn, the observation that the children were found dressed outside of the house five or ten minutes after the fire, the intimation that colored persons were not desired as residents in that particular neighborhood, that a few weeks before there had been another fire in the same house, that the signing of the statement by Louise Carpenter that she was willing to forfeit her insurance if it would keep her out of prison, and finally that the contradictory statements of the witness, Mary, were circumstances definitely and conclusively showing that the fire was of incendiary origin and was authorized and inspired by Louise for fraudulent purposes.

Explanations are offered for all of the above circumstances and elements. Instead of a corroboration of the charge of conspiracy, there are denials supported by positive evidence. The surrounding facts and circumstances given in the explanations readily sustain a conclusion favorable to the insured. While the written statements of Mary affect her credibility, in view of her evidence before the trial court, and the verdict of the jury, the said statements cannot be relied upon as proving the contention of the insurer.

It is apparent that no property of any real value was saved, nor is there any evidence that an attempt was made to save the very essentials for a comfortable living by the occupants of the house, nor a place in which to live. It is apparent that the little negro children had only a small quantity of clothes that they could call their own, and that their first interest was to save these, and that five minutes afforded sufficient time for them to dress. The former fire occurred in the house during the absence of the mother, and its cause was never ascertained. The ignorant and helpless negro mother could have been easily impressed with the necessity to forfeit her insurance to avoid a prison term. The child, Mary, could easily have misunderstood the nature

of the situation. The words of the second statement as to the specific time of "1:30 a. m. Saturday morning, April 27, 1935," and its variance from her first statement, imply assistance by stronger minds in making it. She made five or six statements about the fire, in all of which there is a variance.

 The evidence Mary gave before the jury was positively favorable to her mother's claim. Her contradictory statements made before the trial supported the defendant only to the extent of proving her unreliability and untruthfulness. If it discredited her evidence as wholly unworthy of belief, we cannot accept any of it as sustaining the contention of the defendant. There is no positive or persuasive circumstantial evidence that Louise Carpenter authorized, directed, or consented to the burning of her home. A fair view of all of the evidence, and considering the net result to her, negatives any such conclusion.

The defendant complains that the trial court erred in giving plaintiff's instructions numbers 6 and 8, in the following language:

"No. 6. The Court instructs the jury that even if they believe that Mary L. Carpenter burned the house accidentally or intentionally without the direction of L. Louise Carpenter, they must find against the Insurance Company on the issue as to whether or not L. Louise Carpenter is barred by the burning."

"No. 8. The Court instructs the jury that unless a conspiracy is proven they must ignore all statements made by Mary Carpenter out of the presence of L. Louise Carpenter, as she was not present when said statements were made, and could not cross-examine nor deny the truth of said statements, and that a conspiracy cannot be proven by the statements alone, of Mary L. Carpenter out of the presence of L. Louise Carpenter."

It insists that instruction number 6 is erroneous because an accidental burning is not supported by the evidence, and that this instruction avoids the entire theory of the major

defense, and voids the effect of other instructions granted at the request of the defendant.

The word "accidental" is not easy to define in specific legal terms applicable to every case. It is broad in its scope, and has received many definitions by the courts and text-book writers. If we construe it in its popular and most common meaning, it may be described as an unintended or unexpected event occurring without known or assignable cause. 1 C. J. Secundum, Accident, 425, Accidental, 448.

There is no evidence that Mary Carpenter burned the house accidentally. However, under the definition we have just given, if it be true that the fire occurred unexpectedly, or without intention, and without any known cause, then its occurrence falls within the definition. It is unfortunate that the instruction connects the accidental burning with an act of Mary. It will not be contested, however, that if the house was accidentally burned, the owner could recover. Therefore, whether it was accidentally burned by Mary, by some one of the other children, or by some one else, such burning did not affect the right of the owner to recover, nor did it furnish any defense to the insurer, in the absence of fraudulent collusion by the mother. The burden of proving the fraud rested on the defendant.

The second ground of this assignment involves the major defense theory of the insured. This alleged error will be considered in connection with the refusal of the trial court to grant instruction E, which was in the following language:

"The Court instructs the jury that if they believe from the evidence that L. Louise Carpenter was not at home at the time of the fire but that she had left the building alleged to have been destroyed by fire in the care and control of her daughter, Mary Carpenter, and that the said Mary Carpenter deliberately set fire to the property burned, or any portion thereof, her action would preclude the said plaintiff, L. Louise Carpenter, from any right of recovery in this case, and the jury should find against the said L. Louise Carpenter, and this would be true even though the jury may believe from the evidence that the plaintiff, L.

Louise Carpenter, had given no instructions in respect to said fire and was not present when the same was ignited."

This instruction is based upon the theory that the incendiary act of the agent of the insured is imputed to the insured as a fraudulent loss, and that it is necessarily excepted from a fire policy, upon the principles of general policy and morals.

The learned counsel for the defendant furnishes in his brief an able dissertation upon this question. He undertakes to apply the maritime rule of barratry, denying the owner of a vessel the right of recovery where the loss occurs by the fraudulent or wilful conduct of the master or captain of the vessel in breach of the trust reposed in him, to insurance of property on land. He reviews the law of insurance, and a number of cases involving the application of the principle, and argues that the analogy to the burning of a house by an agent placed in control thereof by the owner is logically similar. He admits, however, that he has been able to find but a single case where has been considered the effect of the fraudulent or wilful burning of the premises by an agent left in control, during the continuance of his agency. The case is that of *Sternberg* v. *Merchant's Fire Assurance Corporation,* 6 F. Supp. 541, decided by the District Court for the Eastern District of Wisconsin.

Much of the comparison of that case with the instant case is removed by the fact that in the Wisconsin case the fire was admittedly of incendiary origin, and there was no dispute as to the general agency of the son and the full representation of the father. In addition, the evidence rather conclusively showed that the fire was caused by the act of the son, who was arrested and convicted therefor.

In the case before us not only is both agency and incendiarism positively denied, but there is no adequate proof of either.

It is admitted the general rule is that the destruction of property by the agent of the insured does not preclude recovery by the insured, in the absence of fraud, connivance, knowledge, or privity upon the part of the insured;

but it is contended that a different situation is presented where an agent has been placed in control of the property, and, in the course of the performance of such duty, deliberately sets fire to it.

Although counsel undertakes to differentiate the case of *Hawkins* v. *Glens Falls Insurance Company,* 115 W. Va. 618, 177 S. E. 442, decided December 4, 1934, he admits that the latter court takes an opposite view of his contention.

In the West Virginia case there was some evidence of suspicious circumstances indicating that the son of the owner of the property, while a tenant on the property, had set the fire. The insurance company contended that the acts of the son were imputable to the father, and prevented a recovery by the latter, although he was not implicated, relying upon the *Sternberg Case, supra.*

Judge Kenna, in an able opinion, criticized the Wisconsin case, and reviewed a number of other cases holding to the contrary thereof. He held that in the effort to ascribe to an insured the responsibility for the tortious act of his servant, the conclusion in the case reviewed was reached upon a *non sequitur* of the major and minor premises therein, and that it did not follow that a criminal act done by an agent without the knowledge and authority of his principal, and without subsequent ratification, could be within the scope of the agent's authority. An incendiary loss was declared to turn not upon the question of agency, but upon the fraudulent privity or consent of the owner.

The question is one of first impression in Virginia. Here the proof of loss was made upon a form furnished by the company, requiring no avowal from the insured that the fire had not occurred by reason of the wilful or fraudulent act of her agent unknown to the principal. The policy was on the Virginia standard form of fire insurance. It had been drawn and prepared by the defendant company, and with all the experience of the years, it contained provisions satisfactory to the company, and permitted by regulatory bureaus of the Government. In the provision relating to hazards not covered, or hazards increased, we do not find

any mention of the hazard of a fire caused by the wilful or deliberate act of the agent or representative of the insured. The custom and practice of not including this defense as an excepted hazard has been long accepted in common use and experience both by the insurer and insured, as indicated by the small number of reported cases dealing with the subject.

Since the terms and provisions of the policy must be construed most strictly against the insurer, it would seem that if it desires the benefit of this exception as a hazard not assumed, it should be included in an express exception, if made with the sanction of the law.

It seems to be the general rule that no fraudulent acts of an agent or of a third person, even though the incendiary be a relative, will void the policy unless the insured is implicated in the fraud. 14 R. C. L., page 1223.

It has been held that mere agency in the absence of proof of privity, consent, or ratification on the part of the insured, will not defeat recovery, in the event that an agent is shown to have burned the property. *Henderson* v. *Western Marine & Fire Insurance Company,* 10 Rob. (La.) 164, 43 Am. Dec. 176; *Feibelman* v. *Manchester Fire Assurance Company,* 108 Ala. 180, 19 So. 540.

We are also unable to agree that where an agent is placed in control of a house on land the situation presents a perfect analogy to that of a vessel at sea in command of a master or captain. Not only the perils of the sea, but the vast difference in the amount of authority, coupled with the discretion to use same, given to the master of a vessel, makes a strong contrast. The master of a vessel not only may navigate the ship from place to place as circumstances and conditions require, and not only may bind the owner of the vessel for supplies and repairs, but there is also conferred upon him a domination practically complete, over the lives and persons of his crew and passengers. The scope of his powers and his agency are much extended beyond the scope of the authority of the ordinary custodian of property on land.

Both because we do not think the facts in this case bring it within the principle sought to be applied by the defendant, and because we are unable to agree that, in the absence of provisions within the policy of fire insurance in question here, the same situation exists with regard to loss by fire of property on land as to vessels on the sea, we do not subscribe to the application of the law of barratry to this case.

The defendant contends that the same objections made to instruction number 6, in many particulars, apply to instruction number 8, but does not point out the particulars.

It is true that instruction number 8 is in conflict with instructions asked and given for the defendant. We find, under the circumstances of this case, no error in instruction number 8. The fact that some of the instructions for the defendant are in conflict therewith is an error invited by the defendant, of which he cannot now complain.

The contract of insurance was proven, as well as the loss thereunder. The defendant upon whom the burden of proof rested, failed to prove that the insured caused her house to be burned in order fraudulently to collect the insurance. The trial court was liberal, both in its ruling admitting evidence favorable to the defendant, and in the instructions given at its request. There was ample evidence introduced to sustain a recovery. The jury saw and heard all of the witnesses, and their attitude and demeanor while on the stand. The trial judge who presided over two trials of this case, had the double opportunity of seeing and observing the witnesses. The verdict of the jury and the judgment of the trial court are entitled to great weight.

We have discovered no error prejudicial to the defendant. The judgment of the trial court will be affirmed.

*Affirmed.*