COURT OF APPEALS OF VIRGINIA


Present:    Chief Judge Fitzpatrick, Judges Benton and Clements
Argued at Alexandria, Virginia


MIGUEL VELASQUEZ

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0033-03-4                      JUDGE JAMES W. BENTON, JR.
                                                       AUGUST 10, 2004
RAY GOODWIN, ACTING COMMISSIONER,
 COMMONWEALTH OF VIRGINIA,
 DEPARTMENT OF SOCIAL SERVICES


            FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                         Donald M. Haddock, Judge

            Dorothy M. Isaacs (Surovell Markle Isaacs & Levy PLC, on brief),
            for appellant.

            Allen T. Wilson, Assistant Attorney General (Jerry W. Kilgore,
            Attorney General; David E. Johnson, Deputy Attorney General;
            Siran S. Faulders, Senior Assistant Attorney General, on brief), for
            appellee.


        Miguel Velasquez appeals the trial judge's decision, which affirmed the administrative

decision of the Virginia Department of Social Services (Department) that Velasquez physically

abused his child.  Velasquez contends the trial judge erred in finding substantial evidence in the

record to support the Department's decision and in ruling that the Department's findings fall

within its specialized competence.  For the reasons that follow, we reverse the decision.

                                            I.

        The Administrative Process Act limits the review of factual issues to a determination

whether there is "substantial evidence in the agency record upon which the agency as the trier of

the facts could reasonably find them to be as it did."  Code § 2.2-4027.  It is well settled that

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

"[t]he phrase 'substantial evidence' refers to 'such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion.'" Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Under this standard, however, an appellate court "may reject the agency's findings of fact . . . 'if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion.'"  Bias, 226 Va. at 269, 308 S.E.2d at 125 (citation omitted).

Under equally well-settled standards, we view the evidence in the light most favorable to the Department and limit our review of issues of fact to the agency record.  State Bd. of Health v. Godfrey, 223 Va. 423, 432, 290 S.E.2d 875, 880 (1982); Fever's, Inc. v. Virginia Alcoholic Beverage Control Bd., 24 Va. App. 213, 218, 481 S.E.2d 476, 478 (1997).  So viewed, the evidence established that on February 3, 2000 Miguel Velasquez and his wife, who was in the United States Army, took their four-month-old daughter to Bethesda Naval Hospital for a well-baby checkup.  When Dr. Paul Reed was examining the child, who had had a low birth weight and was petite, the mother informed him of lumps on the child's chest that she had noticed several days earlier while bathing the child.  X-rays revealed that the child had suffered eight rib fractures that were in various stages of healing.  During the examination, Dr. Reed concluded that the rib fractures were caused by excessive force from the front and the back and were consistent with non-accidental trauma.  Dr. Reed notified the social services agency of the City of Alexandria that Velasquez, who was the child's primary caretaker, may have abused his daughter.

When social workers first interviewed Velasquez, he said he sometimes hugged the child too tight because "he loved her so much."  He also said that he plays rough with the child and that his wife told him to be careful.  In a later interview, Velasquez described squeezing the child with his hands around her midsection to assist her in having a bowel movement because she was

constipated. He also described lying in bed and lifting the child from her crib with one hand wrapped around her midsection and passing her to his wife for breast feeding. When the child's mother was interviewed and asked about her family history, she disclosed that both her grandparents had a history of broken bones. She also said she had "broken a lot of bones" but attributed those events to being "a real tom-boy."

Within two weeks of Dr. Reed's examination, Dr. Barbara Craig, the Director of the Armed Forces Center for Child Protection, reviewed the medical reports and examined the child. She reported that the child's injuries could only have been caused by pushing both the front and back of the chest at the same time. Dr. Craig also concluded that either of the activities Velasquez described could have caused the child's rib fractures.

As succinctly contained in the Department's findings of fact, the following are additional circumstances of this case:

> 12. In the fall of 2000, [the child] underwent a skin biopsy which was submitted for analysis to Dr. Peter Byers, professor of medicine in the Department of Pathology at the University of Washington, Seattle, and director of the University of Washington Collagen Diagnostic Laboratory. Based on the skin biopsy, [the child] was diagnosed as suffering from Osteogenesis Imperfecta, Type I. [The child's] sample was one of only eleven which was positive for OI out of a total of 262 samples analyzed from children who were suspected victims of non-accidental trauma, for the years 1998-2000.

> 13. Dr. Byers testified that it can be difficult to discriminate between fractures caused by non-accidental trauma and those caused by OI on the basis of a clinical examination alone. Radiographs do not always reflect the presence of OI because there must be a 30% reduction in bone density before osteopenia can be detected on a plain x-ray. OI can exist where the only clinical finding is unexplained fractures, and a collagen study such as the one performed on [the child] is a valuable tool in the differential diagnosis of OI.

> 14. Dr. Kenneth Rosenbaum, founder and former chairman of the Department of Medical Genetics at Children's National Medical Center, examined [the child] on October 16, 2000, and confirmed

her diagnosis as Osteogenesis Imperfecta, Type I. Dr. Rosenbaum observed that [the child] was a very petite child, below the fifth percentile for both weight and length, and that the sclerae of her eyes were "mildly blue." Dr. Rosenbaum found [the child's] joints to be mildly hyperextensive. Dr. Rosenbaum also noted that [the mother's] medical history, was remarkable for her notations that she was five feet, one-half inch tall and that she had "had a number of fractures in childhood associated with some degree of trauma." These included a fractured toe, a fractured ankle, fractured coccyx and some stress fractures of the feet. [The mother] also indicated that she felt that she had some degree of hearing loss. Dr. Rosenbaum concluded that based on all the available information, he concluded that [the child] had Type I Osteogenesis Imperfecta, a hereditary metabolic disorder which affects bone structure with a wide variety of physical manifestations. Dr. Rosenbaum noted that the most common clinical finding is an increased risk of fractures. Dr. Rosenbaum described [the child's] OI, Type I as "mild."

15. Dr. Rosenbaum concluded that even a child with OI would have been exposed to "some initiating trauma," even though very minimal, in order to sustain a rib fracture. It is possible for children with OI to sustain fractures by being removed from car seats or by walking, but he stated that, "even in situations like that, there is some mechanical reason for the fracture." Dr. Rosenbaum declined to give an opinion as to the causes of [the child's] rib fractures.

16. Subsequent to [the child's] diagnosis of OI, Type I, Dr. Craig spoke to Dr. Rosenbaum about [the child's] diagnosis, and read his report of his examination of [the child]. Dr. Craig concluded, in a report written on November 20, 2000, that, "[the child] sustained multiple rib fractures on different occasions while she was at such a young age that she could not have generated enough movement or anterior-posterior chest compressive force to cause them herself. The location and characteristics of these fractures is consistent with the stated history of inappropriate handling practices by her father. She may well have a mild form of Osteogenesis Imperfecta, a disease that causes bones to break more easily."

\*       \*       \*       \*       \*       \*       \*

19. On more than one occasion, [the father] encircled [the child's] chest with his hand, grasped her and lifted her from her crib adjacent to his bed, and handed her to her mother for breast feeding.

20. On one occasion, [the father] encircled [the child's] chest with both of his hands, and squeezed her with some force, to assist her to have a bowel movement.

- 4 -

21. The compression exerted by [the father] in lifting [the child] with one hand and squeezing [the child] with both hands, was the cause of [the child] suffering anterior and posterior rib fractures, of differing ages.

22. The record contains a preponderance of the evidence that [the father] caused injury by non-accidental means to [the child], resulting in serious harm to her.

23. The record contains a preponderance of the evidence that [the father] physically abused [the child], causing serious harm to her.

II.

As relevant to this appeal, Code § 63.2-100(1) defines an abused child as one "[w]hose parents or other person responsible for his care creates or inflicts . . . upon such child a physical . . . injury by other than accidental means." Consistent with the statute, the Department's regulations provide that "[p]hysical abuse occurs when a caretaker creates or inflicts . . . upon a child a physical injury other than by accidental means." 22 VAC 40-705-30.

The Supreme Court long ago noted that "[t]he word 'accidental' is not easy to define in specific legal terms applicable to every case." Aetna Ins. Co. v. Carpenter, 170 Va. 312, 324, 196 S.E. 641, 646 (1938). The Court further noted, however, that "[i]f we construe it in its popular and most common meaning, it may be described as an unintended or unexpected event occurring without known or assignable cause." Id. Indeed, the Court has often cited to the following dictionary definitions:

> "Accident: n. An event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event; chance; contingency, often; an undesigned and unforeseen occurrence of an afflicted or unfortunate character; casualty, mishap; as, to die by accident.["]

> "Accidental: adj. Taking place not according to the usual course of things. Synonyms: undesigned; unintended; chance; unforeseen; unexpected; unpremeditated; dependent; conditional; accidental applies to that which happens without design or wholly outside the regular course of things. 'Incidental' (see event) implies a real and, it may be, even a designed relation, but one

> which is secondary and nonessential; as, an incidental result,
> benefit, incidental expense."

Ocean Accident & Guarantee Corp. v. Glover, 165 Va. 283, 285, 182 S.E. 221, 222 (1935)

(quoting Webster's New International Dictionary (1933)).  See also Harris v. Bankers Life &

Cas. Co., 222 Va. 45, 46, 278 S.E.2d 809, 810 (1981).

III.

These principles were ignored by the Department when, as concisely expressed by its

decision, it concluded as follows:

> I conclude that the only real fact in dispute, the actual cause of
> [the child's] rib fractures, was the rough handling by the [father],
> her primary caretaker.  These actions fitting the applicable policy
> definition of "creat[ing] or inflict[ing] . . . upon such child a
> physical . . . injury by other than accidental means" the disposition
> will be sustained.

Simply put, the facts do not support the conclusion drawn by the Department.  It is

undisputed that the child has "Osteogenesis Imperfecta," also known as brittle bone disease,

which is an inherited disorder that made the child more susceptible than the average child to

bone fractures.  The record established that neither parent was aware of the child's genetic

disorder when Dr. Reed detected the fractures.  Likewise, Dr. Reed and Dr. Craig, whom he

consulted, were not aware of the disorder.  After Dr. Craig learned that the child had been

diagnosed with Osteogenesis Imperfecta, which she described as "a disease that causes bones to

break more easily," Dr. Craig tacitly acknowledged that her earlier dismissal of an accidental

cause may have been an error.  She wrote: "I cannot deny that if indeed she does have

[Osteogenesis Imperfecta], her bones would have been somewhat easier to fracture than a normal

infant's under similar circumstances."  Dr. Craig further acknowledged that she "cannot

determine how much force the father would have to have applied to her chest to cause these

fractures based on her presumptive diagnosis of [Osteogenesis Imperfecta]."  However,

- 6 -

Dr. Rosenbaum, the pediatric and genetic specialist who began treating the child for this condition, testified that "you can be taking a child [with Osteogenesis Imperfecta] out of a car seat just like you would any other child and produce a very significant fracture." He elaborated as follows:

> [T]here is a limit, as a parent, I would say as to what can be done many times to prevent fractures in kids with [Osteogenesis Imperfecta] or know how they occurred or why they occurred. I -- I think I gave the example before, it was actually a physician's child, they were just taking their child out of the car seat, something they had done plenty of times, put him in plenty of times. And all of the sudden he fractured his femur, and that was the very first time they knew he had [Osteogenesis Imperfecta].
>
> He had had plenty of tumbles and plenty of normal childhood things, but it was just that right combination of events then that produced a femoral fracture. And he's actually had very significant problems since.
>
> And so I think that's what I meant by uncontrollable events, things that are every-day events that -- that happen all the time, but all of a sudden lead to a fracture.

In other words, he testified that "fractures can occur with minimal trauma in children with [Osteogenesis Imperfecta] and frequently do." As his example demonstrates, this minimal trauma includes events occurring in normal everyday activities of parenting.

Dr. Rosenbaum also explained that the term "mild" when used to describe Type I Osteogenesis Imperfecta does not describe the fragility of the child's bones.

> Q. Focusing on OI Type I individuals and young children at the age of [the child] during the times at issue here and the apparent lack of fractures other than the fractures of the rib, do you have an opinion to a reasonable degree of medical certainty about how fragile the OI you have diagnosed in [the child] has made her?
>
> * * * * * * *
>
> A. My opinion would be that [the child's] OI has made her more susceptible to fractures. I lost the first part of the question. There may have been a part of that --
>
> Q. How much more susceptible than . . . [the average].

* * * * * * *

A. That is very hard to quantify based on what I said before in terms of all of these kind of unknown and sometimes uncontrollable factors that -- that go into producing fractures.

Q. You use the word "mild" when you . . . diagnosed the form. Is that a proper or an improper descriptor of the degree of fragility of her bones?

A. I used the word "mild" for a few reasons. One is that of the four classic types of OI, Type I generally is the "mildest." It doesn't mean there aren't patients with Type I who have very severe OI. But of the four types, it's the mildest form.

And within Type I, there is -- is a tremendous range of variability as I said; with people that don't know they have OI until they come in for something else.

And also I use the word "mild" to suggest that she doesn't have a lot of physical manifestations. You discussed before the radiologic manifestations, that she's mildly affected in terms of the things we see.

You can't quantify that based on the biochemistry. It says she has Type I OI or not; it doesn't say anything else about it. It . . . has no way of doing that.

Dr. Rosenbaum further testified that physicians who treat this condition "generally . . . expect to see some degree of fractures" in children who have Osteogenesis Imperfecta and that "the most universal characteristic of a child with Osteogenesis Imperfecta would be an increased risk for fractures."

The evidence demonstrates that this child, unknown to her parents, was more susceptible than the average child to bone fractures. Velasquez's parenting acts, while deemed to be "rough handling," were not shown to be the type of conduct that would have caused injury to the ordinary child who did not have Osteogenesis Imperfecta. These injuries were not shown to be the natural and probable consequence of lifting a normal child or employing a squeeze to induce a child's bowel movement. Simply put, Velasquez's handling of the child while attempting to discharge parental care was accompanied by the unforeseen and unexpected circumstance of the

- 8 -

child having the genetic disorder of Osteogenesis Imperfecta, making her bones highly susceptible of fracturing.

III.

"We recognize that the substantial evidence standard accords great deference to the findings of the agency, but even under this standard the evidence must be relevant to the conclusion reached." Atkinson v. Virginia Alcohol Beverage Control Comm'n, 1 Va. App. 172, 178, 336 S.E.2d 527, 531 (1985). In this case it was not. For these reasons, we hold that when considering this record as a whole, a reasonable mind would necessarily come to a different conclusion than that reached by the Department. In short, the record fails to establish that the child's injuries were caused "by other than accidental means." Code § 63.2-100(1). In view of this holding, we need not decide whether the trial judge erred in ruling that the Department's findings fall within its specialized competence. Accordingly, we reverse the judgment which upholds the Department's decision.

Reversed and dismissed.

Clements, J., dissenting.

Velasquez contends, on appeal, that the circuit court erred (1) in finding there was substantial evidence in the record to support the finding of the Virginia Department of Social Services (Department) that he physically abused his daughter and (2) in deferring to the specialized competence of the Department. For the reasons that follow, I would affirm the judgment of the circuit court. Accordingly, I respectfully dissent from the majority's opinion.

## I. BACKGROUND

On appeal, this Court views the evidence "in the light most favorable to the agency and limit our review of issues of fact to the agency record." Mulvey v. Jones, 41 Va. App. 600, 602, 587 S.E.2d 728, 729 (2003). So viewed, the evidence established that, on February 3, 2000, Velasquez and his wife, Alice Velasquez, who was in the United States Army, took their four-month-old daughter to Bethesda Naval Hospital for a routine well-baby checkup. Alice Velasquez brought some lumps on her daughter's chest that she had earlier observed while bathing the child to the attention of the attending pediatrician, Dr. Paul Reed. X-rays revealed that the child had suffered eight rib fractures that were in various stages of healing. Some of the fractures were located in the front portion of the child's rib cage and some were located in the rear portion. Dr. Reed concluded that the rib fractures were caused by the simultaneous application of an "excessive amount of force" to the front and back of the child's chest, such as a "squeeze with the hands around the thorax." Observing that infants who receive CPR do not normally sustain rib fractures and that the ribs of a child are much more difficult to fracture than those of an adult, Dr. Reed further concluded that the rib fractures were "consistent with nonaccidental trauma." Dr. Reed did not take steps to rule out Osteogenesis Imperfecta (OI), a hereditary metabolic bone disorder resulting from a collagen defect that commonly increases the risk of fractures, because there were no physical indications that the child suffered from such a disorder.

- 10 -

When Dr. Reed informed the parents about the rib fractures, Alice Velasquez became "quite emotional" and physically distanced herself from her husband, who admitted that he had been "rough" with the child and had squeezed her "on one occasion." Dr. Reed notified the City of Alexandria Department of Human Services (local agency) that Velasquez, who was the child's primary caretaker while his wife worked during the day, may have abused his daughter. The child was transported to Walter Reed Army Medical Center for further examination and referred to the Armed Forces Center for Child Protection.

That same day, Jacquelyn Lusk, a social worker with the local agency, conducted separate interviews with Velasquez and his wife at Walter Reed. Alice Velasquez reported that, although her husband was "very patient" and would never intentionally hurt their child, he did "squeeze[] her too tight sometimes." In his interview, Velasquez admitted that he hugged and squeezed the child "too tight because he love[d] her so much." He also reported that he played "rough with her" and that his wife told him "to be careful with the baby."

Pursuant to an emergency removal order, the child was placed in foster care on February 4, 2000, after which time she suffered no additional fractures.

On February 8, 2000, Lusk conducted a home visit with Velasquez and his wife. During that visit, Velasquez told Lusk that, when the baby was approximately one month old, he squeezed her around her midsection with his hands "to help her have a bowel movement," which caused the baby to cry. Velasquez also told Lusk that, when the baby woke up in the middle of the night, he would reach over to the child without getting out of bed, pick her up out of the crib by grabbing her around her midsection with one hand, and pass her over to his wife on the other side of the bed. Alice Velasquez confirmed that these things did occur and told Lusk that she warned Velasquez that "he should not handle the baby in that manner and be so rough with her."

On February 15, 2000, Dr. Barbara Craig, the Director of the Armed Forces Center for Child Protection and an expert in pediatrics with extensive experience in child abuse cases, examined the child. After reviewing the child's x-rays with Dr. Fleming, a bone radiology specialist, Dr. Craig concluded that the child's fractured ribs could only have been caused by compression of both the front and back of the child's chest at the same time. In reviewing the x-rays and examining the child, Dr. Craig attempted to rule out the possibility that the child suffered from OI. Finding no physical manifestations of OI, Dr. Craig observed that the child "in every way . . . appeared to be a beautiful, healthy, normal child."

When Dr. Craig discussed the rib fractures with Velasquez and his wife and asked them if they knew how such injuries might have occurred, Velasquez stated that, when the child woke up at night, he would, while lying in bed, reach over into the bassinet beside the bed, grab the child around her chest with one hand, lift her out of the bassinet, and hand her to his wife to be breast fed. He also stated that, when the child was constipated, he grabbed her around the chest and abdomen and squeezed her to assist her to have a bowel movement. Dr. Craig concluded that either of these "mechanisms" could have caused the child's rib fractures. Dr. Craig explained that "you would have to use a very significant, a very excessive amount of force to be able to pick a child up in that manner" and "you'd have to squeeze very hard against the ribs so that you could maintain your grip on the child while you were doing that." Dr. Craig also concluded that Velasquez's squeezing the child's midsection to help her have a bowel movement was "the most likely mechanism for causing the rib fractures."

On April 3, 2000, Lusk issued a "Founded - Level 1" disposition of "Physical Abuse" against Velasquez. Velasquez timely requested that the local agency conduct an informal conference to review that disposition.

On September 5, 2000, Dr. Peter Byers, a Professor of Medicine at the University of Washington and the Director of the University of Washington Collagen Diagnostic Laboratory, completed a collagen analysis of a skin biopsy taken from Velasquez's daughter. Based on that analysis, Dr. Byers diagnosed the child as suffering from OI, type I. Dr. Byers opined that "it can be difficult to discriminate between fractures caused by [a nonaccidental injury] and those due to OI, on the basis of a clinical examination alone," because there must be a thirty-percent reduction in bone density before OI can be detected on a plain x-ray. Dr. Byers offered no opinion as to the cause of the child's rib fractures.

On October 16, 2000, Dr. Kenneth Rosenbaum, an expert in pediatric genetics, examined the child and confirmed, based on Dr. Byers's collagen analysis, that, although the child's bone density "look[ed] okay" on x-ray and she did not have "a lot of physical manifestations" normally associated with the disorder, the child had OI, type I. Dr. Rosenbaum explained that, while some patients with OI "have no fractures," the "most common clinical finding in an individual with OI would be an increased risk for fractures." He further explained, however, that even a child with OI would have to be exposed to "some initiating trauma" to sustain a fracture. "[I]t takes the right combination of events to produce the fractures," he explained. Dr. Rosenbaum also explained that, although some children with OI may have a "very minimal trauma and have a very severe fracture," other children with OI may have "very significant trauma and not fracture bone." Dr. Rosenbaum concluded that, while the child's OI made her "more susceptible" to fractures, she had the "mildest form" of OI. He observed that some people with the mild form of OI are unaware they suffer from the disorder until they see a doctor "for something else." He further observed that, because "extremities are more likely to come under certain forces than . . . the axial skeleton," extremity fractures are "more likely" than other fractures in children with OI. Dr. Rosenbaum declined to offer an opinion as to how much more susceptible to fractures the child was than a child without OI.

- 13 -

He further declined to offer an opinion as to the force necessary to produce the child's rib fractures or as to the cause of those fractures. He observed, however, that grabbing a baby around her midsection with one hand and lifting her could potentially cause rib fractures. He further observed that a person's collagen is genetically determined and remains constant throughout the person's life. Dr. Rosenbaum also observed that, during his visit with the child, she, like most "early walker[s]," fell down possibly more than ten times while walking in his office without suffering any adverse effects.

After reviewing the child's diagnosis of OI, type I and speaking with Dr. Rosenbaum, researchers at Dr. Byers's laboratory, and an OI specialist, Dr. Craig opined in a November 20, 2000 report that the child

> sustained multiple rib fractures on different occasions while she was at such a young age that she could not have generated enough movement or anterior-posterior chest compressive force to cause them herself. The location and characteristics of these fractures is consistent with the stated history of inappropriate handling practices by her father. She may well have a mild form of [OI], a disease that causes bones to break more easily. I cannot determine how much force the father would have to have applied to her chest to cause these fractures based on her presumptive diagnosis of OI. . . . [H]er father's admissions of picking this young infant up like a football and "squeezing her chest" like a tube of toothpaste "to help her have a bowel movement" are unacceptable and dangerous forms of child care, demonstrating a lack of parenting skills. . . . I cannot deny that if indeed she does have OI, her bones would have been somewhat easier to fracture than a normal infant's under similar circumstances.

After conducting an informal conference on March 5, 2001, the local agency upheld the finding of physical abuse, level 1 against Velasquez, on March 28, 2001. Velasquez timely noted an appeal of the local agency's decision to the Department's Commissioner.

On October 22, 2001, Dr. Craig further opined regarding the child's rib fractures that

> children with [OI] do not just suddenly for no reason with no mechanism whatsoever fracture[] their ribs in this fashion, and that the OI did not cause the rib fractures, there had to have been some

- 14 -

force applied to the child that resulted in those fractures. And that these rib fractures do appear to be an inflicted type of trauma.

Dr. Craig explained that the fact that the child had no further broken bones after being placed in foster care was a significant factor in determining that the child's OI did not cause her rib fractures:

> [I]f someone has bones that are so easily broken that any day to day activity, any normal parenting would cause their bones to break, then you would think that continued normal parenting, being in a somewhat rough environment in foster care with lots of other children around, and becoming a toddler where she's running around and climbing on things and jumping and falling, and not sustaining new fractures, it tells me her bones aren't particularly brittle, because she's obviously done quite well since then.

Thus, Dr. Craig concluded that, notwithstanding the child's diagnosis of OI, the child's rib fractures were caused by Velasquez's application of "an inappropriate amount of force" to the child's body.

On October 23, 2001, an administrative hearing was held before a hearing officer designated by the Department's Acting Commissioner. In her decision dated January 15, 2002, the hearing officer found that the child "was diagnosed as suffering" from OI, type I, a "mild" form of the disorder. The hearing officer also specifically found as follows:

> 18. [The child] was removed from her home and placed in foster care immediately subsequent to her hospitalization on February 4, 2000. When . . . Velasquez ceased to be her primary caretaker, [the child] sustained no further fractured bones of any sort.

> 19. On more than one occasion, . . . Velasquez encircled [the child's] chest with his hand, grasped her and lifted her from her crib adjacent to his bed, and handed her to her mother for breast feeding.

> 20. On one occasion, . . . Velasquez encircled [the child's] chest with both of his hands, and squeezed her with some force, to assist her to have a bowel movement.

> 21. The compression exerted by . . . Velasquez in lifting [the child] with one hand and squeezing [the child] with both hands, was the cause of [the child] suffering anterior and posterior rib fractures, of differing ages.

Based on these findings, the hearing officer further found that Velasquez "caused injury by non-accidental means" to the child and, thus, "physically abused [the child], causing serious harm to her."[1] Accordingly, the hearing officer sustained the local agency's finding of physical abuse, level 1 against Velasquez. Velasquez filed a timely request for judicial review of the hearing officer's decision.

By order entered December 16, 2002, the circuit court affirmed the hearing officer's decision, concluding that there was substantial evidence in the record to support the hearing officer's finding that Velasquez abused his daughter.

## II. EVIDENCE OF ABUSE

Velasquez argues, on appeal, that the evidence adduced before the hearing officer, showing, as it did, that the child's rib fractures were caused by the child's OI, "did not contain substantial factual evidence that [the child's] injuries were other than accidental" or that he "caused the injuries by abusive behavior." Thus, he contends the circuit court erred in finding the record contained substantial evidence to support a finding that he physically abused his daughter. I disagree.

"The burden of proof rests upon the party challenging the agency determination to show that there was not substantial evidence in the record to support it." Smith v. Dep't of Mines, Minerals and Energy, 28 Va. App. 677, 685, 508 S.E.2d 342, 346 (1998); Code § 2.2-4027.

> Under the Administrative Process Act, the [reviewing] court's duty is "limited to ascertaining whether there was substantial evidence in the agency record" to support its decision. Code § 2.2-4027. "The phrase 'substantial evidence' refers to 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983) ([quoting Consolidated Edison Co. v. NLRB, 305

---

[1] Velasquez did not challenge the hearing officer's finding that the child's rib fractures resulted in "serious harm" to the child, which, pursuant to the Department's regulations, placed the founded disposition at level 1. See 22 VAC 40-700-20(1) ("Level 1 . . . includes those injuries/conditions, real or threatened, that result in or were likely to have resulted in serious harm to a child.").

U.S. 197, 229 (1938)]). A court "may reject the agency's findings of fact, 'only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion.'" Id. (quoting B. Mezines, Administrative Law § 51.01 (1981)).

Mulvey, 41 Va. App. at 603, 587 S.E.2d at 729. The substantial evidence standard is "designed to give great stability and finality to the fact-findings of an administrative agency." Bias, 226 Va. at 269, 308 S.E.2d at 125. In reviewing factual issues, the reviewing court "shall take due account of the presumption of official regularity, the experience and specialized competence of the agency and the purposes of the basic law under which the agency has acted." Code § 2.2-4027. "[T]he reviewing court "'may not exercise anew the jurisdiction of the administrative agency and merely substitute its own independent judgment for that of the body entrusted by the Legislature with the administrative function.'"" Turner v. Jackson, 14 Va. App. 423, 430-31, 417 S.E.2d 881, 887 (1992) (quoting Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 244, 369 S.E.2d 1, 8 (1988) (quoting Virginia Alcoholic Beverage Control Comm'n v. York Street Inn, Inc., 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979))).

The purpose of the statutes and related regulations pertaining to the Department's child protective services are to "protect[] abused children and prevent[] further abuse of those children." J.P. v. Carter, 24 Va. App. 707, 726, 485 S.E.2d 162, 172 (1997). "'Physical abuse occurs when a caretaker . . . inflicts . . . upon a child a physical injury by other than accidental means . . . .'" Mulvey, 41 Va. App. at 603, 587 S.E.2d at 730 (quoting 22 VAC 40-705-30(A)). The caretaker's lack of intent to injure the child does not preclude a finding that the child's physical injury was inflicted "by other than accidental means." See id. at 604, 587 S.E.2d at 730. "'[A] person is presumed to intend the immediate, direct, and necessary consequences of his voluntary act.'" Id. (quoting Nobles v. Commonwealth, 218 Va. 548, 551, 238 S.E.2d 808, 810 (1977)).

Applying these principles to the instant case, I find that substantial evidence supports the hearing officer's factual finding that "[t]he compression exerted by . . . Velasquez in lifting [his

- 17 -

daughter] with one hand and squeezing [her] with both hands, was the cause of [the child] suffering anterior and posterior rib fractures, of differing ages." Velasquez admitted that, without getting out of bed, he would grab his daughter around her chest with one hand, lift her out of her crib, and pass her over to his wife. He further admitted that, when his daughter was constipated, he encircled the child's midsection with both of his hands and, in an attempt to make her have a bowel movement, compressed the child's chest with enough force to make her cry. Dr. Craig concluded that both "mechanisms" were consistent with the child's rib fractures and "unacceptable and dangerous forms of child care." Dr. Craig explained that lifting a baby by grabbing her around the chest with one hand requires a "very significant," "very excessive amount of force." Dr. Craig further concluded that Velasquez's squeezing the child's midsection to help her have a bowel movement was "the most likely mechanism for causing the rib fractures." Upon learning the child had been diagnosed with a mild form of OI, Dr. Craig remained steadfast in her belief that the child's rib fractures were caused by Velasquez's simultaneous application of "an inappropriate amount of force" to the front and back of the child's chest. Dr. Craig's opinion was uncontradicted, as neither Dr. Byers nor Dr. Rosenbaum offered an opinion regarding the cause of the child's rib fractures.

Moreover, I find that substantial evidence supports the hearing officer's factual finding that Velasquez caused the child's injuries by nonaccidental means. The record makes it clear that, regardless of Velasquez's obvious lack of intent to hurt or injure his daughter, in (1) lifting the infant by grabbing her chest with one hand and (2) squeezing his child around the chest with both hands to make her have a bowel movement, he intentionally performed acts the immediate, direct, necessary, and reasonably foreseeable consequences of which were the child's sustainment of several broken ribs. He is presumed, therefore, to have intended the consequences of those voluntary acts. See id.

Nonetheless, Velasquez contends that his conduct did not constitute child abuse because the child's OI diagnosis precludes a finding that he, rather than the OI, was the cause of the child's rib fractures. He argues that, "[u]pon reviewing the record as a whole, a reasonable mind would necessarily come to the conclusion that [the child's] medical condition, which made her bones more fragile than those of a normal infant, was the cause of her rib fractures and not the abusive acts of her father."

It is undisputed that, as Velasquez claims, his daughter has OI and that the OI made her more susceptible than an average child to bone fractures. However, Velasquez's argument that his child's OI diagnosis precludes a finding that he caused her injuries is unpersuasive because it does not take into account the fact that a child with OI may also be the victim of a fracture caused by abusive, nonaccidental trauma inflicted by the caretaker. Because OI and abuse may occur concomitantly, the two diagnoses are not, as Velasquez appears to claim, necessarily mutually exclusive.

Here, substantial evidence supports the hearing officer's finding that, notwithstanding the child's OI, Velasquez's actions constituted physical abuse. Not only did Dr. Craig, in assigning blame for the child's injuries to Velasquez before she knew of the OI diagnosis, conclude that Velasquez's actions were severe enough to cause the ribs of a child without O.I. to fracture, Dr. Rosenbaum observed that children, like Velasquez's daughter, who have the "mildest" form of OI may not even know they suffer from the disorder until they see a doctor "for something else." Dr. Rosenbaum further observed that children with OI are "more likely" to suffer extremity fractures than other fractures and that lifting a baby by grabbing her midsection with one hand could potentially cause rib fractures in a child without OI. Most importantly, the child had no further fractures after being removed from Velasquez's care. As Dr. Craig concluded, it is clear from such evidence, that, in light of the child's activities and the fact that a person's collagen remains

constant throughout her life, the child's "bones [were not] particularly brittle" at the time she suffered the rib fractures. No evidence refuted that conclusion.

I would hold, therefore, that, considering the record as a whole, a reasonable mind would not *necessarily* come to a different conclusion than that reached by the hearing officer. Hence, in my view, the circuit court correctly found that there was substantial evidence in the record to support the hearing officer's finding that Velasquez physically abused his daughter.

### III. DEFERENCE TO THE DEPARTMENT

Velasquez also contends on appeal that the circuit court erred in deferring, in its review of the hearing officer's decision, to the agency's specialized competence because his daughter's rare metabolic bone disorder was outside the Department's specialized competence. Moreover, he argues, unlike his experts, "the experts relied on by the Department did not have sufficient expertise regarding this medical condition" to assist the hearing officer in her understanding and appreciation of the "devastating effect" of the disorder. Thus, he concludes, the hearing officer's finding of child abuse was not entitled to any deference by the circuit court in this case.

Velasquez, however, made no such argument before the circuit court. Pursuant to Rule 5A:18, this Court "will not consider an argument on appeal [that] was not presented to the [circuit] court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998). "The purpose of [this] rule is to ensure that the [circuit] court and opposing party are given the opportunity to intelligently address, examine, and resolve issues in the [circuit] court, thus avoiding unnecessary appeals." Andrews v. Commonwealth, 37 Va. App. 479, 493, 559 S.E.2d 401, 408 (2002).

I would hold, therefore, that, having failed to give the circuit court an opportunity to consider the matter and, if necessary, take steps to correct it, Velasquez is procedurally barred by Rule 5A:18 from raising the issue for the first time on appeal. Moreover, my review of the

record in this case does not reveal any reason to invoke the "good cause" or "ends of justice" exceptions to Rule 5A:18.

## IV.  CONCLUSION

For these reasons, I would affirm the judgment of the circuit court upholding the Department's decision.